UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NORTH PLAINFIELD BOARD OF EDUCATION, | : | CIVIL ACTION NO. 05-4398 (MLC) |
|  | : |  |
|  | : | **MEMORANDUM OPINION** |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ZURICH AMERICAN INSURANCE COMPANY, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| ZURICH AMERICAN INSURANCE COMPANY, | : |  |
|  | : |  |
| Third-party Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | : |  |
|  | : |  |
| Third-party Defendant. | : |  |

**COOPER, District Judge**

    Plaintiff, North Plainfield Board of Education (the
"Board"), commenced this action on August 8, 2005 in New Jersey
Superior Court, against Zurich American Insurance Company
("Zurich") alleging (1) that it is entitled to specific
performance of a certain insurance contract, (2) breach of
contract, and (3) breach of the duty of good faith and fair
dealing.  (Dkt. entry no. 1-3, Compl.)  Zurich removed this
action on September 8, 2005.  (Dkt. entry no. 1, Not. of
Removal.)  Thereafter, on December 8, 2005, this Court issued an

Order for Temporary Restraints, which directed Zurich to fund the
Board's defense in D & D Associates, Inc. v. Board of Education
of North Plainfield, No. 03-1026 (MLC) (the "D&D Action") in
accordance with the terms of that order.  (Dkt. entry no. 18, 12-
8-05 Ord.)

Zurich, on March 6, 2006, filed a third-party complaint
against National Union Fire Insurance Company of Pittsburgh, PA.
("National Union") seeking "a declaratory judgment and ancillary
monetary relief relative to the rights and obligations of the
parties pertaining to insurance coverage including a duty to
defend" the Board in connection with the D&D Action.  (Dkt. entry
no. 27, 3d Party Compl., at ¶ 1.)  The Board, in turn, amended
the complaint on May 15, 2006 to include the following claims
against National Union: (1) breach of contract; (2) declaratory
judgment; and (3) breach of the duty of good fath and fair
dealing.  (Dkt. entry no. 42, Amend. to Compl.)  Thus, National
Union is named as both a defendant and third-party defendant in
this action.

The Board moves for summary judgment against National Union
seeking certain relief relating to two state court actions
pending against the Board.  (Dkt. entry no. 48.)  Specifically,
the Board seeks a judgment declaring that National Union must (1)
indemnify it against the non-breach of contract claims asserted
in the two state court actions, (2) pay unlimited defense costs

2

with respect to the non-breach of contract claims asserted in the two state court actions, and (3) pay defense costs for the breach of contract claims asserted in the two state court actions up to an aggregate limit of $100,000 for each separate breach of contract claim.  (1st Board Br., at 2-3.)[1]  The Board separately moves for summary judgment against National Union seeking certain relief relating to the D&D Action.  (Dkt. entry no. 53.)  Specifically, the Board seeks a judgment declaring that National Union (1) must indemnify the Board against, and pay unlimited defense costs with respect to, certain counts contained in the amended complaint in the D&D Action, (2) must pay defense costs for the breach of contract claims asserted against the Board in the D&D Action up to an aggregate limit of $100,000 for each separate breach of contract claim, and (3) acted in bad faith when it insisted that the Board release its rights under the

---

[1] To avoid confusion, the Board's brief in support of its first motion for summary judgment will be referred to as "1st Board Br." (see dkt. entry no. 48-3), and its brief in support of its second motion for summary judgment will be referred to as "2d Board Br." (see dkt. entry no. 53-7).  Similarly, National Union's (1) brief in opposition to the Board's first motion for summary judgment will be referred to as "1st National Union Br." (see dkt. entry no. 52), (2) statement of material facts in opposition to the Board's first motion for summary judgment will be referred to as "1st National Union Stmt. of Mat. Facts" (see dkt. entry no. 52-2), (3) brief in opposition to the Board's second motion for summary judgment will be referred to as "2d National Union Br." (see dkt. entry no. 71), and (4) statement of material facts in opposition to the Board's second motion for summary judgment will be referred to as "2d National Union Stmt. of Mat. Facts" (see dkt. entry no. 71-2).

relevant insurance policy before it would pay the Board's defense costs with respect to the D&D Action. (2d Board Br., at 2-3.) Moreover, Zurich moves for summary judgment against the Board pursuant to Federal Rule of Civil Procedure 56. (Dkt. entry no. 55.) The Court held oral argument on these motions on February 21, 2007. (Dkt. entry no. 74.)[2] For the reasons stated herein, the Court will (1) deny the Board's first motion for summary judgment against National Union, (2) deny the Board's second motion for summary judgment against National Union, and (3) grant Zurich's motion for summary judgment against the Board.

## BACKGROUND

### I.   The Parties

The Board is a public body with its principal offices in North Plainfield, New Jersey. (Dkt. entry no. 1-3, Compl., at ¶ 4.) National Union is a Pennsylvania corporation licensed to conduct business in New Jersey. (Dkt. entry no. 27, 3d Party

---

[2] These separate summary judgment motions were denied without prejudice and with leave to renew by letter because the Court determined that it was in the best interests of both the Court and the parties to address the relief sought here simultaneously with, or soon after, addressing certain relief sought in the D&D Action. (Dkt. entry no. 75, 3-2-07 Ord.) The Board renewed its separate motions by letter on March 2, 2007. (Dkt. entry no. 76, 3-2-07 Greenberg Letter.) Similarly, Zurich renewed its separate motion on March 5, 2007. (Dkt. entry no. 77, 3-5-07 Reilly Letter.) On December 21, 2007, this Court issued a memorandum opinion and order addressing the relief sought in the D&D Action ("12-21-07 Memorandum Opinion & Order"). D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry nos. 264, 265.

Compl., at ¶ 4.)  National Union issued three consecutive "School Leaders Errors and Omissions" Policies to the Board covering the periods of July 1, 2002 to July 1, 2003 (policy number 511-96-96), July 1, 2003 to July 1, 2004 (policy number 299-50-31), and July 1, 2004 to July 1, 2005 (policy number 985-78-55) (hereinafter collectively referred to as, the "Policy").  (Dkt. entry no. 53-2, Greenberg Decl., at ¶ 3; id., Ex. 2, Policy; see 1st Board Br., at 1; 1st National Union Stmt. of Mat. Facts, at ¶ 6; 2d National Union Stmt. of Mat. Facts, at ¶ 6.)  In general, the Policy requires National Union to pay all sums the Board becomes obligated to pay as damages resulting from any "Claim" asserted against the Board and reported to National Union during the relevant policy period "for any Wrongful Act of the [Board] in performance of duties for the School Entity."  (Dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy, at Insuring Agreements ¶ 1 ("Errors and Omissions").)

Zurich is an insurance company incorporated under the laws of New York, but licensed to conduct business in New Jersey. (Dkt. entry no. 27, 3d Party Compl., at ¶ 2.)  Zurich issued a Commercial Insurance Policy (Top II Package Policy) CPO 214 6634 06 to "Fleet Insurance Services, LLC New Jersey School Board Insurance Program and the Entities Listed on Named Insured Endt." for the policy period of July 1, 2002 to July 1, 2003 ("Zurich Policy").  (Zurich Stmt. of Undisp. Mat. Facts, at ¶ 39.)  The

Zurich Policy identifies the Board as a Named Insured, and provides general liability coverage of $1,000,000 per occurrence and $2,000,000 in the aggregate.  (Id.)  The Zurich Policy is governed by ISO form # CG 00 01 10 01, which provides insuring agreement language, exclusions, and definitions pertaining to liability coverage.  (Id. at ¶ 40.)

## II.  General Overview of the D&D Action

The Board, in 2001, requested bids for a $30 million project to renovate and expand five of its schools (the "Project").  (1st Board Br., at 3; 1st National Union Stmt. of Mat. Facts, at ¶ 1; 2d National Union Stmt. of Mat. Facts, at ¶ 1; Zurich Stmt. of Undisp. Mat. Facts, at ¶ 1.)[3]  D & D Associates, Inc. ("D&D"), the lowest bidder for the general construction work, entered into three separate contracts with the Board in connection with the Project: (1) Contract 1A, which covered the East and West End Schools; (2) Contract 1B, which covered Middle High School and the Stoney Brook School; and (3) Contract 1C, which covered Somerset School.  (1st Board Br., at 3; 1st National Union Stmt. of Mat. Facts, at ¶ 1; 2d National Union Stmt. of Mat. Facts, at ¶ 1; Zurich Stmt. of Undisp. Mat. Facts, at ¶ 2.)  The contracts between D&D and the Board required D&D to post performance and payment bonds, which D&D obtained from American Motorists

---

[3] Pages 3 through 6 of the 1st Board Br. contain its Statement of Undisputed Facts in support of its first motion for summary judgment.  (1st Board Br., at 3-6.)

Insurance Company (the "Surety"). (1st Board Br., at 3; 1st National Union Stmt. of Mat. Facts, at ¶ 2; 2d National Union Stmt. of Mat. Facts, at ¶ 2; Zurich Stmt. of Undisp. Mat. Facts, at ¶ 2.)

Over the next several years, the relationship between D&D and the Board broke down and became adversarial. (See Zurich Stmt. of Undisp. Mat. Facts, at ¶¶ 4-7.) On March 4, 2003, the Board terminated D&D with respect to Contract 1C, effective immediately. (Id. at ¶ 6; 1st Board Br., at 3.) On March 10, 2003, D&D commenced the D&D Action in this Court, asserting various claims against the Board and others involved with the Project. D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 1. Several months later, on July 23, 2003, the Board terminated D&D with respect to the two remaining Project contracts, Contract 1A and Contract 1B, effective immediately. (Zurich Stmt. of Undisp. Mat. Facts, at ¶ 7; 1st Board Br., at 3.) Thereafter, D&D filed an amended complaint in the D&D Action alleging additional claims against the Board and others, including (1) federal civil rights violations, (2) violations of the New Jersey Trust Fund Law, N.J.S.A. § 2A:44-148, (3) breach of contract, (4) "errors and omissions", (5) tortious interference with prospective economic advantage, (6) defamation, (7) conversion, (8) fraudulent inducement, (9) civil conspiracy,

and (10) malicious abuse of process ("Amended Complaint").  D & D
Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 58, Am.
Compl.

　　　After various defendants filed motions for summary judgment
in the D&D Action, this Court issued the 12-21-07 Memorandum
Opinion & Order, which, inter alia, granted in part and denied in
part the separate motions and entered judgment in favor of the
Board and against D&D as to count 1, count 5, count 6, count 7,
count 9, count 11, count 15, and count 16 of the Amended
Complaint.  Id., dkt. entry nos. 264 & 265, 12-21-07 Mem. Op. &
Ord.  Thus, at this stage in the litigation, only the following
of D&D's sixteen claims remain, insofar as asserted against the
Board: (1) count 2 (civil rights-liberty interest, destruction of
prequalification for public works contracts without due process);
(2) count 3 (retaliatory termination for exercise of First
Amendment rights); (3) count 4 (First Amendment retaliation for
seeking redress in federal court); (4) count 8 (breach of
contract); (5) count 10 (tortious interference); (6) count 12
(conversion); (7) count 13 (fraudulent inducement); and (8) count
14 (fraudulent inducement-rescission of performance bonds).  Id.,
dkt. entry no. 264, 12-21-07 Mem. Op., at 82.

**III. General Overview of the P.J. Smith Action**

　　　P.J. Smith Electrical Contractors, Inc. ("P.J. Smith") was
the electrical contractor for the Project.  (1st Board Br., at 4;

8

1st National Union Stmt. of Mat. Facts, at ¶ 5; 2d National Union
Stmt. of Mat. Facts, at ¶ 5.)   P.J. Smith commenced an action
against the Board in New Jersey Superior Court on January 5,
2005, P.J. Smith Electrical Contractors, Inc. v. North Plainfield
Board of Education, No. SOM-L-23-05 (N.J. Super. Ct. Jan. 5,
2005) (the "P.J. Smith Action").  (Dkt. entry no. 48-2, Greenberg
Decl., Ex. B, Compl. in P.J. Smith Action.)   There, P.J. Smith
alleges that, inter alia, the Board (1) breached its contract
with P.J. Smith by interfering with its work and "consistently
placing [it] in the position of having to work around, work
inefficiently or work under congested conditions", (2) breached
the implied covenant of good faith and fair dealing, and (3) was
unjustly enriched to the detriment of P.J. Smith, and thus, P.J.
Smith is entitled to quantum meruit compensation.  (Id.; see 1st
Board Br., at 4; 1st National Union Stmt. of Mat. Facts, at ¶ 5;
2d National Union Stmt. of Mat. Facts, at ¶ 5.)

IV.  **General Overview of the Surety Action**

The Surety and the Board entered into a Takeover Agreement
on May 15, 2003 with respect to Contract 1C.  (1st Board Br., at
4; see 1st National Union Stmt. of Mat. Facts, at ¶ 2; 2d
National Union Stmt. of Mat. Facts, at ¶ 2.)  The Surety and the
Board entered into two additional Takeover Agreements in
connection with Contract 1A and Contract 1B on June 2, 2004.
(1st Board Br., at 4; see 1st National Union Stmt. of Mat. Facts,

at ¶ 2; 2d National Union Stmt. of Mat. Facts, at ¶ 2.)  Pursuant to each Takeover Agreement, the Surety agreed that, inter alia, it would take over the work to be performed under the Project contracts and arrange for the substantial completion of construction.  (See 1st Board Br., at 4.)

The Surety commenced an action against the Board in New Jersey Superior Court on April 12, 2005, American Motorists Insurance Co. v. North Plainfield Board of Education, No. L-543-05 (N.J. Super. Ct. April 12, 2005) (the "Surety Action").  (Dkt. entry no. 48-2, Greenberg Decl., Ex. C, Compl. in Surety Action.) There, the Surety alleges that, inter alia, the Board breached (1) the Takeover Agreements by failing and refusing to pay the Surety for approved requisitions earned by the Surety for completing the remaining work on the Project contracts, (2) the Takeover Agreements by failing to grant time extensions to the Surety and compensate it for additional costs incurred in completing the Project contracts, and (3) the covenants of good faith and fair dealing implied in the Takeover Agreements.  (Id.; 1st Board Br., at 5 (explaining that the Surety alleges that the Board breached the three Takeover Agreements because (1) "since December 2003, it has submitted requisitions in connection with the work performed on Contract 1C totaling $1,544,481.74, all of which has not been paid", (2) it is owed $253,044.33 for work performed under Contract 1A and the corresponding Takeover

Agreement, and (3) it is owed $409,852.08 for work performed under Contract 1B and the corresponding Takeover Agreement); see 1st National Union Stmt. of Mat. Facts, at ¶ 4; 2d National Union Stmt. of Mat. Facts, at ¶ 4.)

## V.   Events Preceding this Action

### A.   Events Related to the D&D Action

The Board, through its insurance broker, notified National Union about the D&D Action on March 19, 2003.  (2d Board Br., at 6.)[4]  The Board also sent a letter to Zurich on March 19, 2003 informing it about the D&D Action.  (See Zurich Stmt. of Undisp. Mat. Facts, at ¶ 42.)  National Union acknowledged receipt of the complaint in the D&D Action in a letter dated April 2, 2003, and agreed to defend the Board under a reservation of rights in a subsequent letter dated April 16, 2003.  (2d Board Br., at 6.) Similarly, in a letter dated May 14, 2003, Zurich advised the Board that it would defend it in the D&D action "subject to a partial disclaimer of coverage".  (Zurich Stmt. of Undisp. Mat. Facts, at ¶ 42.)

When D&D filed the Amended Complaint in August 2003, the Board promptly forwarded a copy to both National Union and Zurich.  (2d Board Br., at 6.)  Additionally, the Board notified National Union that Zurich had agreed to pay a portion of its

---

[4] Pages 3 through 9 of the 2d Board Br. contain its Statement of Facts in support of its second motion for summary judgment.  (Id. at 3-9.)

defense costs in connection with the D&D Action, and stated that National Union should pay the difference between the total amount of legal fees Zurich pays and the amount of fees the Board actually incurs.  (Id.)  National Union did not respond to this letter.  (See id.)  Thus, in a letter dated October 19, 2004, the Board again requested that National Union defend and indemnify it with respect to D&D's claims asserted in the Amended Complaint. (Id. at 7.)  National Union responded in a letter dated December 16, 2004, in which it disclaimed all indemnity coverage under the Policy, but agreed to pay the Board's defense costs incurred in connection with D&D's breach of contract claims up to the aggregate limit of $100,000 "in exchange for the appropriate release".  (Id.)  Further, National Union asserted that certain Policy exclusions applied with respect to the D&D Action.  (Id. at 8.)  The parties exchanged additional correspondence detailing their respective coverage positions regarding the D&D Action, but were unable to reach any agreement.  (See id.)

Zurich also acknowledged receipt of the Amended Complaint in a letter to the Board dated March 2, 2005.  (Zurich Stmt. of Undisp. Mat. Facts, at ¶ 43.)  Zurich noted that it had a duty to defend the Board with respect to D&D's defamation claim (count 11), subject to a reservation of rights, but denied that it had any duty to defend the Board with respect to D&D's other claims. (Id.)  Zurich also noted that certain Zurich Policy exclusions

12

may apply to preclude coverage with respect to any damages incurred in connection with D&D's defamation claim.  (Id. at ¶ 45.)  The Board disagrees with Zurich's coverage position.

**B.    Events Related to the P.J. Smith Action & Surety Action**

The Board, after being served with the complaints in the P.J. Smith Action and the Surety Action, "tendered defense and indemnity" of the claims asserted in those actions to National Union.  (1st Board Br., at 5.)  In an Acknowledgment Letter dated January 20, 2005, AIG Technical Services ("AIG"), on behalf of National Union, advised the Board that a claim number had been assigned to the P.J. Smith Action and promised a coverage position.  (1st National Union Stmt. of Mat. Facts, at ¶ 12; 2d National Union Stmt. of Mat. Facts, at ¶ 12.)  Timothy M. Stys ("Stys"), the Board's secretary and school business administrator, wrote to Lisa Porcaro ("Porcaro"), the AIG claims analyst assigned to the P.J. Smith Action.  (1st National Union Stmt. of Mat. Facts, at ¶ 14; 2d National Union Stmt. of Mat. Facts, at ¶ 14.)  Stys explained to Porcaro that the P.J. Smith Action arose out of the Project, and requested that Robert C. Epstein be appointed as the Board's defense counsel in that action due to his law firm's familiarity with the Project and its related legal proceedings.  (1st National Union Stmt. of Mat. Facts, at ¶ 14; 2d National Union Stmt. of Mat. Facts, at ¶ 14.)

Porcaro responded to Stys in a letter dated March 7, 2005, in which she (1) further acknowledged receiving the complaint in the P.J. Smith Action, (2) advised the Board that the Policy would serve as excess over any other insurance, and (3) noted that National Union was not amenable to "assignment of non-panel counsel".  (1st National Union Stmt. of Mat. Facts, at ¶ 15; 2d National Union Stmt. of Mat. Facts, at ¶ 15.)  Further, she referred the Board to a Policy endorsement, which excludes breach of contract claims but provides an aggregate limit of $100,000 for defense of breach of contract claims.  (1st National Union Stmt. of Mat. Facts, at ¶ 15; 2d National Union Stmt. of Mat. Facts, at ¶ 15; 1st Board Br., at 5.)  National Union later agreed that Robert C. Epstein and his law firm, Greenberg Traurig, could defend the Board in connection with the P.J. Smith Action and the Surety Action.  (See 1st National Union Stmt. of Mat. Facts, at ¶ 16; 2d National Union Stmt. of Mat. Facts, at ¶ 16; 1st Board Br., at 5.)

Porcaro, on behalf of National Union, sent a letter to the Board acknowledging receipt of the complaint in the Surety Action on May 16, 2005.  (1st National Union Stmt. of Mat. Facts, at ¶ 16; 2d National Union Stmt. of Mat. Facts, at ¶ 16.)  In this letter, Porcaro again referenced the Policy endorsement excluding claims arising out of breach of contract from coverage.  (1st National Union Stmt. of Mat. Facts, at ¶ 16; 2d National Union

14

Stmt. of Mat. Facts, at ¶ 16.)  Additionally, she advised the
Board that because the P.J. Smith Action and Surety Action arose
"out of the same Wrongful Act" both would be under one deductible
and subject to the $100,000 aggregate limit for defense of breach
of contract claims.  (1st National Union Stmt. of Mat. Facts, at
¶ 16; 2d National Union Stmt. of Mat. Facts, at ¶ 16.)  The Board
disagrees with National Union's coverage positions with respect
to both the P.J. Smith Action and the Surety Action.

**DISCUSSION**

## I.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the
movant is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The movant bears the initial burden of
showing that there is no genuine issue of material fact.  Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has
met this prima facie burden, the non-movant must "set out
specific facts showing a genuine issue for trial."  Fed.R.Civ.P.
56(e)(2).  A non-movant must present actual evidence that raises
a genuine issue of material fact and may not rely on mere
allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.  Legal Standards Governing Construction of Insurance Policies

New Jersey law provides that when interpreting an insurance policy, a court should give the policy's terms their plain and ordinary meaning.  Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231, 236 (3d Cir. 2006) (citing New Jersey Supreme Court).  "If the policy language is clear, the policy should be interpreted as written, [but] [i]f the policy is ambiguous, the policy will be construed in favor of the insured."  Id. (alterations in original; citation omitted); see Feszchak v. Pawtucket Mut. Ins. Co., No. 06-0076, 2008 U.S. Dist. LEXIS 29295, at *3 (D.N.J. April 8, 2008) (stating that an ambiguity in an insurance policy should be construed to "comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning").  "The use of reference books is an accepted method of ascertaining the 'ordinary' meaning of terms" used but not defined in an insurance policy.  Boddy v. Cigna Prop. & Cas. Cos., 760 A.2d 823, 826 (N.J. App. Div. 2000).

Insurance policy exclusions must be narrowly construed, and the burden is on the insurer to show that the claim falls within the exclusion.  Lloyds of London, 458 F.3d at 236; Feszchak, 2008 U.S. Dist. LEXIS 29295, at *3-*4; Gibson v. Callaghan, 730 A.2d 1278, 1283 (N.J. 1999); Am. Motorists Ins. Co. v. L-C-A Sales Co., 713 A.2d 1007, 1013 (N.J. 1998).  However, exclusions are

17

presumed valid and must be given effect if they are specific, clear, plain, prominent, and not contrary to public policy. Lloyds of London, 458 F.3d at 236 (citing New Jersey cases). The New Jersey Supreme Court has recognized that in exceptional circumstances, insurance policies should be construed to reflect the reasonable expectations of the insured even when the literal meaning of the policy is plain and clear. See id.; Feszchak, 2008 U.S. Dist. LEXIS 29295, at *3 (explaining that under certain circumstances the plain language of a policy term may be overcome if it conflicts with the reasonable expectations of the insured); Gibson, 730 A.2d at 1283 (same); Am. Motorists Ins. Co., 713 A.2d at 1013 (same). The Third Circuit has concluded that "exceptional circumstances" warranting a court to construe a clear and unambiguous policy exclusion in accordance with the reasonable expectations of the insured rather than in accordance with exclusion's plain language, arise only when literal application of the exclusion would violate public policy. Lloyds of London, 458 F.3d at 237. Thus, absent public policy concerns, the Court should construe an insurance policy exclusion according to the plain meaning of its terms.

## III. Legal Standards Applied Here

### A.   The Board's First Motion for Summary Judgment Against National Union

In support of its first motion for summary judgment against National Union, the Board argues that National Union "wrongfully

refused to indemnify the Board against the non-breach of contract claims asserted in the [P.J. Smith Action and the Surety Action], and also has refused to fully honor its defense obligations under the Policy, erroneously contending that the [P.J. Smith Action and the Surety Action] only assert breach of contract claims." (1st Board Br., at 1.)  The Board notes that the Policy provides coverage for damages resulting from any "Claim" made against the Board arising from a "Wrongful Act", which, according to the Board, includes breach of contract, negligence, intentional misconduct, and civil rights violations.  (Id. at 7-8.)  The Board also notes that National Union must defend it with respect to any Claim asserting that it committed a Wrongful Act, and pay for all costs incurred in such defense.  (Id. at 10.)

The Board acknowledges that the Policy contains an exclusion for Claims "arising out of breach of contract".  (Id. at 11.) Nevertheless, the Board argues that the breach of the duty of good faith and fair dealing claims asserted against the Board in both the P.J. Smith Action and the Surety Action do not arise out of breach of contract, and thus, National Union must indemnify the Board and pay unlimited defense costs in accordance with the Policy with respect to those claims.  (Id. at 13-14.)  Similarly, the Board argues that National Union is obligated to indemnify the Board against, and pay its unlimited defense costs with respect to, the quantum meruit claim asserted in the P.J. Smith

19

Action because such claim also does not arise out of breach of contract.  (Id. at 15.)  The Board then suggests that "it would be impossible to determine whether defense costs apply to one or another cause of action and National Union therefore must pay unlimited defense costs as to all of the allegations in th[ose] [a]ctions."  (Id.)  In the alternative, the Board contends that National Union must pay unlimited defense costs for the non-breach of contract claims, and must pay defense costs up to the aggregate limit of $100,000 for each separate breach of contract claim asserted in the P.J. Smith Action and the Surety Action. (See id. at 16-19.)

National Union, in contrast, argues that all of the claims asserted against the Board in the P.J. Smith Action and the Surety Action arose out of the contractual or quasi-contractual relationship between the Board and the plaintiffs in those actions.  (1st National Union Br., at 10.)  National Union emphasizes that the Policy expressly excludes claims "arising out of breach of contract", but acknowledges that it must defend such claims up to an aggregate limit of $100,000.  (Id. at 9-10.) Accordingly, National Union contends that the quantum meruit and breach of the duty of good faith and fair dealing claims asserted in the P.J. Smith Action and the Surety Action are not independent Wrongful Acts, but instead have a substantial nexus with the contracts at issue.  (Id. at 10-13.)  Thus, National

Union argues that both actions are subject to the total defense limit of $100,000.  (Id. at 13.)

The Policy generally states that National Union agrees:

[t]o pay on behalf of the [Board] all sums which the [Board] shall become legally obligated to pay as Damages resulting from any Claim first made against the [Board] and reported to [National Union] during the Policy Period for any Wrongful Act of the [Board] in the performance of duties for the School Entity.

(Dkt. entry no. 48-2, Greenberg Decl., Ex. A, Policy, at Insuring Agreements ¶ 1.)[5]  A "Claim" is defined as (1) a judicial proceeding alleging a "Wrongful Act" and seeking damages, which is brought against an insured such as the Board in a court of law or equity, or (2) an administrative hearing.  (Id. at Endorsement #4.)  A "Wrongful Act" is defined as an Employment Practices Violation, or an Insured's actual or alleged breach of duty, neglect, error, misstatement, or omission in performing duties for the school.  (Id. at Endorsement #11.)  Thus, the entire judicial proceeding or administrative hearing commenced against the Board constitutes a Claim, while the individual causes of action asserted in such proceeding or hearing may constitute Wrongful Acts.

The Policy lists a number of coverage exclusions, including an exclusion stating that the Policy does not apply to any Claim

_____

[5] The Policy applicable to the P.J. Smith Action and the Surety Action bears Policy Number 985-78-55 and covers the period from July 1, 2004 to July 1, 2005.  (See id.)

"arising out of breach of contract" but National Union must "defend such a Claim in accordance with Insuring Agreement 2(a) subject to an aggregate limit of $100,000." (Id. at Exclusions, Endorsement #6.)  In defending a Claim "arising out of breach of contract", the Policy requires National Union to, inter alia, appoint an attorney and pay all expenses incurred in the defense up to the aggregate limit of $100,000.  (See id. at Endorsement #7 (replacing Insuring Agreements ¶ 2(a) in its entirety).) Accordingly, the Policy does not provide coverage for (i.e., does not require National Union to pay damages resulting from) a judicial proceeding alleging a Wrongful Act "arising out of breach of contract", but does create a limited obligation on the part of National Union to pay for some defense costs incurred in defending such judicial proceeding.

New Jersey courts have expansively interpreted the phrase "arising out of" as meaning "originating from, growing out of, or having a substantial nexus with the activity for which coverage is provided." Am. Motorists Ins. Co., 713 A.2d at 1010 (listing New Jersey cases).  Further, the Third Circuit adopted a New Jersey Appellate Division case and applied a "but for" test to an insurance policy provision excluding coverage for "advertising injury arising out of breach of contract". Houbigant, Inc. v. Fed. Ins. Co., 374 F.3d 192, 202-03 (3d Cir. 2004) (determining that although the relationship of the parties was contractual,

22

the actions of the insured were "independently tortious" and the "contractual relationship was not endemic" to the insured's trademark infringement).  Such test requires a determination of whether but for the breach of contract the injury would not have occurred.  Id.

The "arising out of breach of contract" policy exclusion, which is contained in Endorsement #6, is specific, clear, plain, and prominent.  See Lloyds of London, 458 F.3d at 236 (stating that if policy language is clear, it should be interpreted as written).  Thus, applying the case law discussed above, the Court finds that the plain language of this exclusion, read in accordance with all relevant policy language, expressly provides that National Union is not obligated to pay damages resulting from a judicial proceeding commenced against the Board that (1) alleges that the Board committed a breach of duty, neglect, error, misstatement, or omission, and (2) originated from, grew out of, or had a substantial nexus with breach of contract.  Moreover, the Court finds that National Union is not obligated to pay damages resulting from a judicial proceeding commenced against the Board that alleges an injury that would not have occurred but for the Board breaching a contract.  See Houbigant, Inc., 374 F.3d at 202-03.  The Court notes that there are no exceptional circumstances suggesting that application of the exclusion's plain language would violate or impede any public

policy, particularly because errors and omissions insurance polices are only intended to provide limited types of coverage. See Lloyds of London, 458 F.3d at 237; see also Search EDP, Inc. v. Am. Home Assurance Co., 632 A.2d 286, 288 (N.J. App. Div. 1993) (explaining that "the essential purpose of an errors and omissions policy is to cover liability risks unique to and inherent in the practice of a particular profession and which transcend the customary business risks which the practice of a profession shares with the conduct of other types of business enterprises").

P.J. Smith asserts the following claims against the Board in the P.J. Smith Action: (1) breach of contract (count 1); (2) breach of implied covenant of good faith and fair dealing (count 2); and (3) quantum meruit (count 3). (Dkt. entry no. 48-2, Greenberg Decl., Ex. B, Compl. in P.J. Smith Action.) Similarly, the Surety asserts the following claims against the Board in the Surety Action: (1) breach of Contract 1C Takeover Agreement (count 1); (2) breach of Contract 1A Takeover Agreement (count 2); (3) breach of Contract 1B Takeover Agreement (count 3); (4) additional claims for compensation and time extensions constituting breach of the Takeover Agreements (count 4); and (5) breach of the covenant of good faith and fair dealing (count 5). (Id., Ex. C, Compl. in Surety Action.) The covenant of good faith and fair dealing is implied in every contract in New

Jersey, and thus, there must be a contract between the parties for this Court to conclude that such covenant existed and that it was breached.  Space v. BRPM Towing Serv., Inc., No. 07-947, 2007 U.S. Dist. LEXIS 93724, at *16-*17 (D.N.J. Dec. 21, 2007).  Also, to establish a quantum meruit claim, the plaintiff must show that (1) the "defendant received a benefit and . . . retention of the benefit without payment would be unjust", and (2) the plaintiff "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  Royale Luau Resort, LLC v. Kennedy Funding, Inc., No. 07-1342, 2008 U.S. Dist. LEXIS 11902, at *30 (D.N.J. Feb. 19, 2008) (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)); Iliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007) (same); see Castro v. NYT Television, 851 A.2d 88, 98 (N.J. App. Div. 2004).  Accordingly, both a breach of the covenant of good faith and fair dealing claim and a quantum meruit claim require that the parties had either a contractual or quasi-contractual relationship, and thus, the same conduct used to establish a breach of contract claim would be used to establish either of these types of claims.

The Court therefore finds that the breach of the covenant of good faith and fair dealing and quantum meruit claims asserted against the Board in the P.J. Smith Action and the Surety Action

initiated from and have a substantial nexus with the breach of contract claims asserted in those actions.  See Am. Motorists Ins. Co., 713 A.2d at 1013 (finding that "arising out of and in the course of employment" language in insurance policy was unambiguous and precluded coverage for wrongful discharge claim that "unquestionably arose out of and in the course of [the plaintiff's] employment, as did the essential factual allegations on which the cause of action was predicated").  Further, the Court finds that the alleged injuries underlying the P.J. Smith Action and Surety Action would not have occurred but for the Board's alleged breach of its contract with P.J. Smith and the Takeover Agreements entered into with the Surety.  See Houbigant, Inc., 374 F.3d at 202-03.  Accordingly, the Court holds that the P.J. Smith Action and the Surety Action each constitute a Claim arising out of breach of contract because the contractual relationship between the parties was "endemic" to all causes of action asserted in those actions, and such causes of action "originated from" or "grew out of" the Board's alleged breach of the contractual relationships.

The Court will accordingly deny the Board's first motion for summary judgment insofar as it seeks an order directing National Union to indemnify the Board and pay its unlimited defense costs with respect to the breach of the covenant of good faith and quantum meruit claims asserted in the P.J. Smith Action and

Surety Action.  However, the Policy requires National Union to defend each Claim arising out of breach of contract subject to a collective or total limit of $100,000.  Webster's Ninth New Collegiate Dictionary 64 (1991) (defining "aggregate" as, inter alia, "collective" or "taking all units as a whole").  As noted above, a Claim is defined as, inter alia, a judicial proceeding alleging a Wrongful Act and seeking damages.  (Dkt. entry no. 48-2, Greenberg Decl., Ex. A, Policy, at Endorsement #4.)  The P.J. Smith Action and the Surety Action constitute separate and distinct Claims because they are separate and distinct judicial proceedings alleging Wrongful Acts.[6]  Nevertheless, we reject the Board's contention that National Union must "pay defense costs for the breach of contract claims on the basis that the 'aggregate limit of $100,000' applies to total defense costs for each separate breach of contract claim."  (1st Board Br., at 21.) Instead, the Court holds that National Union is obligated under the Policy to appoint counsel and pay the costs incurred in defending the Board against all claims asserted against it in the (1) P.J. Smith Action up to the collective or whole sum of $100,000, and (2) Surety Action up to the collective or whole sum of $100,000.  (See dkt. entry no. 48-2, Greenberg Decl., Ex. A,

---

[6] The Court rejects National Union's assertion that these two distinct actions should be treated as one Claim because they allege the same Wrongful Acts; they are separate and distinct proceedings alleging Wrongful Acts and thus constitute separate Claims.  (See 1st National Union Br., at 13-15.)

Policy, at Endorsement #6.)  Therefore, the Court will deny the
Board's first motion for summary judgment against National Union
in its entirety.

**B.    The Board's Second Motion for Summary Judgment Against
        National Union**

In its second motion for summary judgment, the Board argues
that National Union has breached the policy by refusing to
provide indemnity coverage and pay unlimited defense costs in
connection with the D&D Action.  (2d Board Br., at 1.)  The Board
asserts that the Amended Complaint in the D&D Action contains
several claims alleging that the Board committed Wrongful Acts,
which include intentional acts and civil rights violations.  (Id.
at 11-15.)  The Board further asserts that "each and every one of
the claims asserted against the Board in the [D&D] Action is
covered by the terms of the Policy and none of the exclusions
apply."  (Id. at 17-29 (reviewing each count of the Amended
Complaint and explaining why no policy exclusion bars coverage
for such count); see id. at 16-17 (explaining that Policy
exclusion 2 does not remove count 1 of the amended complaint from
coverage).)[7]  Thus, the Board contends that because none of the

_____

[7] In the 12-21-07 Memorandum Opinion & Order, this Court
granted summary judgment in favor of the Board and against D&D
with respect to count 1 (civil rights-Fourth Amendment, Fifth
Amendment, Fourteenth Amendment seizure of property), count 5
(civil rights-intimidation of witness), count 6 (civil rights-
illegal garnishment without due process of law), count 7 (quia
timet-New Jersey law), count 9 (errors and omissions), count 11
(defamation), count 15 (civil conspiracy), and count 16

Policy's exclusions apply to D&D's non-breach of contract claims, National Union must indemnify it against, and pay unlimited defense costs with respect to count 2, count 3, count 4, count 10, count 12, count 13, and count 14 of the Amended Complaint. (Id. at 28-29.)

With respect to count 8 of D&D's Amended Complaint, which is a breach of contract count, the Board argues that the Policy "unquestionably" requires National Union to defend the Board and pay defense costs related to that claim.  (Id. at 29.)  The Board further argues that within count 8, D&D asserts three separate breach of contract claims arising from the separate terminations of Contract 1A, Contract 1B, and Contract 1C.  (Id. at 30-31 (explaining that each of these contracts relates to a separate construction project involving different schools and different architectural designs).)  The Board asserts that each of these alleged breaches constitutes separate Wrongful Acts under the Policy, and thus, National Union must pay defense costs up to the "aggregate limit of $100,000" for each breach of contract claim, for a total of $300,000. (See id. at 31-34 (asserting that the "aggregate limit" language simply refers to the different types

_____

(malicious abuse of process) of the Amended Complaint.  D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry nos. 264, 12-21-07 Mem. Op., at 81-82.)  Thus, the Court will not address the Board's arguments regarding National Union's obligation to indemnify it against, and pay unlimited defense costs with respect to, those counts that are no longer pending against it in the D&D Action.

of defense costs set forth in Insuring Agreement ¶ 2(a)).)   The
Board contends that because D&D's breach of contract claims were
made in two different policy periods, "National Union is
responsible for total defense costs of $200,000 for each of D&D's
breach of contract claims – or a total of $600,000."  (<u>Id.</u> at 34-
35.)  Last, the Board contends that National Union's refusal to
pay defense costs with respect to D&D's breach of contract claims
unless the Board first releases any and all rights it has under
the Policy violates the New Jersey Unfair Claims Settlement
Practices Act, N.J.S.A. § 17:29B-1 <u>et</u> <u>seq.</u>, ("UCSPA").  (<u>Id.</u> at
35-36.)

National Union, in contrast, asserts that D&D's Amended
Complaint alleges "fraudulent, malicious, intentional and
reckless" conduct by the Board that is not encompassed by the
Policy's definition of a Wrongful Act.  (2d National Union Br.,
at 13-14.)  National Union notes that providing insurance
coverage for claims alleging intentional acts violates New Jersey
public policy.  (<u>Id.</u> at 14.)  Further, National Union argues that
the Policy's exclusions preclude or otherwise limit coverage with
respect to, <u>inter</u> <u>alia</u>, count 2, count 3, count 4, count 8, count
10, count 12, count 13, and count 14 of the Amended Complaint.
(<u>Id.</u> at 15-21.)

National Union emphasizes Endorsement #6, which contains the
"arising out of breach of contract" exclusion.  (<u>See</u> <u>id.</u> at 21-

22.)  Specifically, National Union argues that all of D&D's
allegations against the Board arise out of or find their origin
in the Board's alleged breach of the contractual relationship it
had with D&D, and therefore, National Union is not obligated to
indemnify the Board with respect to any of D&D's claims pursuant
to the exclusion contained in Endorsement #6.  (Id.)  National
Union acknowledges that it must defend the Board with respect to
a Claim arising out of breach of contract, but explains that (1)
a Claim is a judicial proceeding and does not depend upon the
number of individual contracts in dispute, and (2) it is only
responsible for defending such Claim up to the total amount of
$100,000 for the life of the Claim (i.e., the aggregate limit
does not reset when a new policy period begins).  (Id. at 23-25.)
Accordingly, National Union contends that the D&D Action falls
outside the parameters of the Policy's coverage provisions, but
it is obligated to provide $100,000 in the aggregate to fund the
Board's defense to D&D's claims.  (See id. at 1-2.)

     The Policy applicable to the D&D Action bears Policy Number
511-96-96 and covers the period from July 1, 2002 to July 1,
2003.  (See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy
bearing Policy Number 511-96-96.)  This Policy contains identical
provisions to the later Policy bearing Policy Number 985-78-55,
which is applicable to the P.J. Smith Action and Surety Action
and was discussed in detail above.  (Id.)  However, because an

31

earlier Policy applies to the D&D Action, there are certain
Endorsements that were not adopted until the later Policy
applicable to the P.J. Smith Action and Surety Action was in
effect.  Thus, applicable exclusions and definitions are not
necessarily found under the same Endorsement number as the later
Policy, which was discussed in detail above.  (See id. at
Endorsement #2 (defining "Claim" in same way as defined in
Endorsement #4 of later Policy bearing Policy Number 985-78-55),
Endorsement #9 (defining "Wrongful Act" in the same way as
defined in Endorsement #11 of later Policy bearing Policy Number
985-78-55), Endorsement #4 (setting forth same "arising out of
breach of contract" exclusion found in Endorsement #6 of later
Policy bearing Policy Number 985-78-55).)  The Court will not
restate the relevant Policy definitions and exclusions in this
section since they are identical to the provisions set forth
above.  Nevertheless, we will cite to the location of these
provisions in the Policy applicable to the D&D Action, which
bears Policy Number 511-96-96, in addressing the parties'
arguments in support of and in opposition to the Board's second
motion for summary judgment, which relates exclusively to the D&D
Action.

Of the sixteen counts contained in the Amended Complaint
only the following counts remain insofar as asserted against the
Board: (1) count 2 (civil rights-liberty interest, destruction of

prequalification for public works contracts without due process);
(2) count 3 (retaliatory termination for exercise of First
Amendment rights); (3) count 4 (First Amendment retaliation for
seeking redress in federal court); (4) count 8 (breach of
contract); (5) count 10 (tortious interference); (6) count 12
(conversion); (7) count 13 (fraudulent inducement); and (8) count
14 (fraudulent inducement-rescission of performance bonds).  See
D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 264,
12-21-07 Mem. Op., at 82.  After reviewing these remaining
counts, the Court concludes that the D&D Action constitutes a
Claim because it is a judicial proceeding in which the plaintiff
alleges that the Board committed several Wrongful Acts, including
breaches of duty, misstatements, and misleading statements or
omissions.  See generally id., dkt. entry no. 58, Am. Compl.
(See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy bearing
Policy Number 511-96-96, at Endorsement #2 (defining "Claim"),
Endorsement #9 (defining "Wrongful Act").)[8]  After considering

---

[8] The Court agrees with the Board that the causes of action
D&D asserts against the Board in the Amended Complaint constitute
Wrongful Acts under the Policy. (2d Board Br., at 11-15.)  A
Wrongful Act is broadly defined as an "alleged breach of duty,
neglect, error, misstatement, misleading statement or omission".
(See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy bearing
Policy Number 511-96-96, at Endorsement #9.)  A reasonable
insured reviewing such definition would expect that it may
encompass (1) civil rights violations involving breach of duties,
neglect, or error, (2) intentional torts, (3) breach of contract
claims, (4) tortious interference claims, and (5) fraud claims.
See Feszchak, 2008 U.S. Dist. LEXIS 29295, at *3 (stating that an
ambiguity in an insurance policy should be construed to "comport

the scope and breadth of these remaining claims as well as the evidence and proof that will be needed to ultimately establish each claim, the Court also concludes that the D&D Action is a judicial proceeding or Claim "arising out of breach of contract". (See id. at Endorsement #4.)  Thus, it is excluded from coverage under the Policy.  (See id.)

The Court has already determined that the plain language of the "arising out of breach of contract" exclusion, read in accordance with all relevant policy language, expressly provides that National Union is not obligated to indemnify the Board with respect to damages resulting from a judicial proceeding alleging a Wrongful Act, if such proceeding originated from, grew out of, or had a substantial nexus with breach of contract.  (See id.) In count 8, D&D alleges that it furnished labor and materials for the Project, but the Board breached its contracts with D&D "by refusing to make payments to D&D, improperly interfering with the performance of D&D's work, improperly demanding extra work through unpriced 'field directives' to avoid the formal change order process, improperly threatening defaults and terminations, and improperly terminating D&D's work on Contracts 1A, 1B, and 1C."  D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no.

---

with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning"); Gibson, 730 A.2d at 1283 (explaining that insurance policies must be construed in accordance with the reasonable expectations of the insured).

58, Am. Compl., at 36-37.   The Court finds that D&D's other remaining claims against the Board grew out of the same alleged misconduct underlying D&D's breach of contract claim.

We previously determined, with respect to count 2, that because D&D asserted that the Board damaged its reputation as well as terminated it from the Project contracts, D&D sufficiently alleged that the Board interfered with a protected liberty interest in violation of the Fourteenth Amendment.  Id., dkt. entry no. 264, 12-21-07 Mem. Op., at 25.  Similarly, we determined that D&D sufficiently alleged in count 3 and count 4 that the Board, among others, retaliated against it in violation of the First Amendment by issuing default letters and terminating it from the Project contracts.  See id. at 26-33.  In count 10, D&D asserts that, inter alia, the Board and others intentionally interfered with its prospective economic advantage by interfering with its "performance of its contracts, its business arrangements with its subcontractors and suppliers, and its bonding relationship with [the Surety]."  Id., dkt. entry no. 48, Am. Compl., at 40.  Further, in count 12, D&D asserts that after terminating D&D from the Project contracts, the Board and others deprived D&D of "certain of its equipment, and leaseholds in equipment and material (including leased scaffolding equipment)" and other items from the Project sites, and converted to its own use certain funds owing to D&D and its suppliers.  Id. at 43.

35

Last, in count 13 and count 14 D&D asserts, <u>inter alia</u>, that the Board and others intentionally failed to disclose problems and delays that were material to D&D's decision to bid on and enter into the Project Contracts.  <u>Id.</u> at 44.

All of these counts flow from or bear a substantial nexus with count 8, D&D's breach of contract claim, because they arise from the same essential facts and circumstance, namely the Board's alleged (1) misrepresentations and omissions that induced D&D to enter into the Project contracts, (2) interference with D&D's performance of its work on the Project, (3) issuance of default letters to D&D threatening termination, (4) publishing false statements about D&D's performance of the Project contracts, and (5) wrongful termination of the Project contracts. <u>See</u> <u>Am. Motorists Ins. Co.</u>, 713 A.2d at 1010.  Further, the alleged injuries forming the basis of each of these claims would not have occurred but for the Board's alleged breach of the Project contracts.  <u>See</u> <u>Houbigant, Inc.</u>, 374 F.3d at 202-03. Thus, National Union has met its burden of establishing that the breach of contract exclusion found in Policy Endorsement #4 applies to the D&D Action.[9]  The Court thus finds that National

_____

[9] Other Policy exclusions may also apply to the claims asserted against the Board in the D&D Action.  (<u>See</u> 2d National Union Br., at 15-21 (arguing that various Policy exclusions exclude or otherwise limit the coverage available to the Board); 2d Board Br., at 15-20 (arguing that Policy exclusions do not apply to most of D&D's claims against the Board).)  However, because we have determined that the "arising out of breach of

Union is not obligated to indemnify the Board and pay its unlimited defense costs with respect to the remaining counts asserted against the Board in the D&D Action.  However, National Union is obligated to defend a Claim arising out of breach of contract "in accordance with Insuring Agreement 2a subject to an aggregate limit of $100,000."  (See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy bearing Policy Number 511-96-96, at Endorsement #4.)  Because the D&D Action (i.e., the entire judicial proceeding) constitutes a Claim, National Union must appoint counsel and pay the Board's defense costs and related expenses, as required by Insuring Agreement ¶ 2a, subject to the total or collective limit for all types of defense costs and expenses incurred in defending the D&D Action of $100,000.  (See id., at Endorsement #4, Endorsement #6 (restating Insuring Agreement ¶ 2a).)  See Webster's Ninth New Collegiate Dictionary 64 (1991) (defining "aggregate").[10]

_____

contract" exclusion precludes coverage with respect to the D&D Action, we need not address the applicability of the other policy exclusions to D&D's claims and the action as a whole.

[10] The Court rejects the Board's argument that because there are three separate contracts underlying D&D's breach of contract claim, National Union must provide up to $100,000 of defense costs for each separate "alleged breach of duty", for a total of $300,000.  (2d Board Br., at 30-32.)  The exclusion contained in Endorsement #4 requires National Union to defend a "Claim" "arising out of breach of contract" subject to the aggregate limit of $100,000.  (See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy bearing Policy Number 511-96-96, at Exclusions, Endorsement #4.)  A Claim is a judicial proceeding that alleges individual Wrongful Acts.  Thus, National Union must defend the

The Board argues that National Union is estopped from denying the Board coverage with respect to the D&D action because National Union did not raise any coverage defenses in its April 16, 2003 letter to the Board.  (2d Board Br., at 37.)  Further, the Board argues that National Union did not (1) "act with reasonable promptness to disclaim coverage after the Board sent D&D's [A]mended [C]omplaint to the carrier", or (2) respond to the Board's request for coverage in connection with the Amended Complaint until December 16, 2004, a date sixteen months after the Board sent the Amended Complaint to the carrier.  (Id. at 37-

---

entire judicial proceeding subject to the stated aggregate defense limit, not each individual Wrongful Act or cause of action asserted within such judicial proceeding.

The Court also rejects the Board's argument that because D&D's breach of contract claim relating to Contract 1C arose during the Policy period from July 1, 2002 to July 1, 2003 and its breach of contract claims relating to Contract 1A and Contract 1B arose during the Policy period from July 1, 2003 to July 1, 2004, National Union must pay $200,000 of total defense costs for each breach of contract claim.  (2d Board Br, at 34-35.)  The Policy generally requires National Union to pay damages resulting from "any Claim first made against the [Board] and reported to [National Union] during the Policy Period for any Wrongful Act".  (See dkt. entry no. 53-2, Greenberg Decl., Ex. 2, Policy bearing Policy Number 511-96-96, at Insuring Agreements ¶ 1.)  It then excludes Claims arising out of breach of contract, but requires that they be defended up to an aggregate limit. (Id., at Endorsement #4.)  Thus, a Claim arising out of breach of contract, which is reported during the applicable Policy period, must be defended up to the $100,000 limit.  Only the Policy in effect on the date that the Claim or judicial proceeding was reported to the insured creates a defense obligation.  Here, the D&D Action was reported to National Union in March 2003, and thus only the Policy bearing Policy number 511-96-96, in effect from July 1, 2002 to July 1, 2003 imposes any obligations on National Union with respect to that action.

38.)  The Court rejects these arguments, however, and finds that National Union promptly informed the Board of its coverage position with respect to the D&D Action, and thus, estoppel is not appropriate here.

D&D commenced the D&D Action on March 10, 2003.  Shortly thereafter, in a letter dated April 2, 2003, an AIG representative informed the Board that it had established a claim number for the D&D Action "so that a proper evaluation of coverage under the [P]olicy can be made" and the Board would be informed when a coverage position was established.  (Dkt. entry no. 53-4, Greenberg Decl., Ex. 4, 4-2-03 Ciampi Letter.) Further, in a letter to the Board dated April 16, 2003, an AIG representative, inter alia, (1) stated that according to AIG's review of the materials provided by the Board, the D&D Action "arises from allegations that the [Board] wrongfully terminated claimant's contract", (2) directed the Board's attention to the breach of contract exclusion contained in Endorsement #4 of the Policy, and (3) noted that National Union was "providing a defense under a reservation of rights letter because some or all of the claims may be excluded under the terms and conditions of the [P]olicy."  (Dkt. entry no. 53-5, Greenberg Decl., Ex. 5, 4-16-03 Volonakis Letter.)  Accordingly, National Union did not unreasonably delay in informing the Board that it believed D&D's claims arose out of breach of contract and the breach of contract

exclusion contained in the Policy would likely exclude coverage. See Griggs v. Bertram, 443 A.2d 163, 168 (N.J. 1982) ("once an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned").

The Court thus concludes that because National Union promptly informed the Board of its coverage position and the potential applicability of certain Policy exclusions to D&D's claims, National Union is not estopped from denying coverage to the Board with respect to the D&D Action.  See id. at 167 (explaining that an insurer may be estopped from asserting the inapplicability of insurance to a particular claim despite a clear exclusion if the insurer undertakes to defend a lawsuit based upon a claim against its insured without asserting a valid reservation of rights to deny coverage at a later time). Therefore, the Court will deny the Board's second motion for summary judgment against National Union in its entirety.[11]

---

[11] The Board argues that National Union recognized its obligations to pay some defense costs with respect to D&D's breach of contract claims against the Board, but refused "to live up to its obligation . . . unless the Board first agrees to release any and all rights it may have under the Policy."  (2d Board Br., at 35.)  The Board contends that this is a violation of the UCSPA.  (Id. at 35-36.)  However, there is no private right of action under the UCSPA.  Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 264 (3d Cir. 2007) (noting that the absence of

### C.   **Zurich's Motion for Summary Judgment Against the Board**

Zurich notes that since March 2003 it has contributed to the Board's defense based solely on D&D's libel and slander claim (count 11 of the Amended Complaint), and has disclaimed coverage for all other claims asserted against the Board in the D&D Action.  (Zurich Br., at 16.)  Zurich also notes that while it agreed to contribute towards the Board's defense based on D&D's libel and slander allegations, it reserved its right to later disclaim coverage.  (Id. at 16-17.)  In its original brief in support of its motion for summary judgment against the Board, Zurich argued that "it is [now] clear that the Libel and Slander claim asserted by D&D against the Board is expressly excluded under the Zurich Policy pursuant to the [arising out of] Breach of Contract Exclusion. . . .  As such, Zurich is also under no duty to continue to contribute towards the defense of the Board".  (Id. at 17.)  Zurich further argued that (1) the Board's allegedly defamatory statements relate directly to D&D's alleged

---

a private right of action under the UCSPA was not an insurmountable obstacle to plaintiff's claims); Bush v. RMS Ins., No. 08-1133, 2008 U.S. Dist. LEXIS 34642, at *7 (D.N.J. April 21, 2008) ("In order for an individual to pursue a claim under the [UCSPA], they must first file a complaint with the Commissioner - as such, there is no per se individual private right of action."); Klimowicz v. Unum Life Ins. Co. of Am., No. 04-2990, 2007 U.S. Dist. LEXIS 73162, at *10 (D.N.J. Sept. 28, 2007) (stating that the court need not decide the preemption issue because UCSPA does not provide a private cause of action); see N.J.S.A. § 17:29B-5 (describing power of commissioner).

breaches of the Project contracts, and (2) "but for" D&D's alleged breaches of the contracts, the Board would have had no reason to publish the statements underlying D&D's libel and standard claim. (Id. at 20.) With respect to the fifteen other claims D&D asserted against the Board, Zurich argued that it was not obligated to indemnify the Board for any damages incurred as a result of those claims because they "simply do not fall within the relevant Insuring Agreements of the Zurich Policy." (Id. at 23; see id. at 23-34.) Thus, Zurich requested that this Court enter an order declaring that (1) the Board is not entitled to coverage under the Zurich Policy for any of the claims D&D asserts against the Board in the D&D Action, and (2) Zurich has no further duty to defend or indemnify the Board with respect to the D&D Action. (Id. at 39.)

The Board, in its response, emphasized that the Zurich Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'personal advertising injury'". (Board Br. in Opp. to Zurich Mot., at 9.) The Board then asserted that D&D's libel and slander claim falls within the Zurich Policy's definition of "personal and advertising injury". (Id.) The Board further asserted that the Zurich Policy exclusion for "'personal and advertising injury' arising out of a breach of contract" does not apply to D&D's libel and slander claim because "the alleged defamatory conduct

of the Board was independently tortious and was not endemic to
any breach of contract by either party."  (Id. at 12; see id. at
12-17.)

The Board stated that apart from D&D's libel and slander
claim, several other counts of the Amended Complaint assert
"libel-type allegations", such as count 1, count 2, count 3, and
count 10, and thus, Zurich must also defend and indemnify the
Board with respect to those claims.  (Id. at 4.)  However, the
Board conceded that "there is no coverage for the non-libel
allegations asserted against it in the [D&D] Action."  (Id.)  In
the alternative, the Board argued that Zurich was estopped from
denying coverage with respect to D&D's libel and slander claim
because (1) it agreed to defend the Board in a letter dated May
14, 2003 and did not raise any objections to coverage or assert
that a Zurich Policy exclusion applied to that claim, (2) it
received the Amended Complaint in September 2003 but did not
reserve its right to disclaim coverage on the basis of a Zurich
Policy exclusion until March 2, 2005, and (3) this Court entered
an order directing Zurich to fund the Board's defense, which
stated that the Zurich Policy was enforceable and that the Board
was entitled to coverage.  (Id. at 17-19).

The Zurich Policy provides coverage for, inter alia, "direct
physical loss of or damage to" certain "Covered" property,
including school buildings and property used to maintain or

43

service such buildings.  (See dkt. entry no. 56, Hoffman Cert.,
Ex. G, Zurich Policy, at Bldg. & Personal Prop. Coverage Form.)
Such coverage is subject to many limitations, exceptions, and
exclusions.  (See generally id. and subsequent provisions.)
Moreover, the Zurich policy provides the following general
commercial liability coverage:

> We will pay those sums that the insured becomes legally
> obligated to pay as damages because of "bodily injury"
> or "property damage" to which this insurance applies.
> We will have the right and duty to defend the insured
> against any "suit" seeking those damages.  However, we
> will have no duty to defend the insured against any
> "suit" seeking damages for "bodily injury" or "property
> damage" to which this insurance does not apply.  We
> may, at our discretion, investigate any "occurrence"
> and settle any claim or "suit" that may result.
> . . .
>
> We will pay those sums that the insured becomes legally
> obligated to pay as damages because of "personal and
> advertising injury" to which this insurance applies.
> We will have the right and duty to defend the insured
> against any "suit" seeking those damages.  However, we
> will have no duty to defend the insured against any
> "suit" seeking damages for "personal and advertising
> injury" to which this insurance does not apply.  We
> may, at our discretion, investigate any offense and
> settle any claim or "suit" that may result.

(Id., at Commercial Gen. Liability Coverage Form, Section I-
Coverages, Coverage A Bodily Injury and Property Damage Liability
("Coverage A") & Coverage B Personal and Advertising Injury
Liability ("Coverage B").)

The Zurich Policy defines "occurrence" as an accident,
including continuous exposure to the same generally harmful
conditions.  (Id., at Commercial Gen. Liability Coverage Form,

44

Section V-Definitions, ¶ 13.)  Further, "personal and advertising
injury" is defined as "injury, including consequential 'bodily
injury', arising out of one of more of the following offenses:"
(1) false arrest or imprisonment, (2) malicious prosecution, (3)
wrongful eviction or wrongful entry, (4) oral or written
publication of slanderous, libelous, or disparaging material, or
material that violates a person's privacy right, (5) using
another person's advertising idea as ones own idea, and (6)
copyright or trade dress infringement in an advertisement.  (Id.
at ¶ 14.)  Last, a "suit", for purposes of the general commercial
liability coverage, means "a civil proceeding in which damages
because of 'bodily injury', 'property damage' or 'personal and
advertising injury' to which this insurance applies are alleged."
(Id. at ¶ 18.)

### 1.   D&D's Libel and Slander Claim Against the Board

This Court, in the D&D Action, determined that the Board was
entitled to unqualified immunity under the New Jersey Tort Claims
Act, N.J.S.A. § 59:2-10, with respect to D&D's libel and slander
claim (count 11 of the Amended Complaint).  D & D Associates,
Inc., No. 03-1026 (MLC), dkt. entry no. 264, 12-21-07 Mem. Op.,
at 64-66.  Accordingly, we granted summary judgment in favor of
the Board on D&D's libel and slander claim.  Id. at 66; see id.,
dkt. entry no. 265, 12-21-07 Ord.  Because D&D's libel and
slander claim is no longer pending insofar as asserted against

the Board, we need not address Zurich's request for an order
declaring that the Zurich Policy does not provide coverage for,
or require Zurich to continue defending the Board with respect
to, such claim.  Also, it is not necessary for this Court to
address whether any Zurich Policy exclusion applies to D&D's
libel and slander claim insofar as asserted against the Board.
(See dkt. entry no. 78, 2-8-08 Hoffman Letter, at 6 (explaining
that the issue of whether the "breach of contract" exclusion
contained in the Zurich Policy applies to count 11 of the Amended
Complaint is moot because (1) judgment was entered in favor of
the Board as to count 11, and thus, Zurich cannot have any duty
to indemnify the Board with respect to that count, and (2) there
is no duty to defend when there is no duty to indemnify).)

### 2.   D&D's Due Process Claim Against the Board

Zurich argues that D&D's libel and slander claim against the
Board, was "the only potentially covered count for which Zurich
had been providing a defense to the Board."  (Dkt. entry no. 78,
2-8-08 Hoffman Letter, at 2.)  Accordingly, Zurich contends that
because this Court granted the Board's motion for summary
judgment with respect to D&D's libel and slander claim, "there is
no longer a potentially covered claim", and thus, Zurich has no
further obligation to defend the Board in the D&D Action.  (Id.)
The Board acknowledges that this Court granted summary judgment
in favor of the Board with respect to D&D's libel and slander

46

claim.  (Dkt. entry no. 86, 2-28-08 Greenberg Letter, at 1.)
However, the Board asserts that Zurich's general position is
untenable because the Zurich Policy also provides coverage for
the claims D&D asserts in count 2 and count 10 of the Amended
Complaint.  (Id., at 1-7.)

     D&D, in count 2 of the Amended Complaint, alleges that (1)
it was prequalified to serve as a general contractor for the New
Jersey Economic Development Authority, (2) the Board sent it
default letters, which interfered with its bonding capacity and
ability to bid on public works projects, and (3) "the Board
through its representatives . . . falsely and willfully published
statements to the effect that D&D was performing its work in a
sloppy and incomplete manner, was leaving work unfinished, . . .
performed defective work", and abandoned the Project.  D & D
Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 58, Am.
Compl., at 21-23.  D&D contends that the Board and the other
defendants' conduct deprived it of certain liberty interests,
including its prequalification status for public works contracts,
good reputation, and vested interest in its right to bid on
public works projects.  Id. at 23-24.  This Court concluded that
(1) "impairment of employment opportunities does not imbue a
claim based on injury to one's reputation with a constitutional
element", (2) D&D's financial loss associated with the alleged
injury to its bonding capacity is not constitutionally protected,

47

and (3) reputation alone is not a liberty or property interest protected by the Fourteenth Amendment.  Id., dkt. entry no. 86, 9-30-05 Mem. Op., at 11.  However, this Court noted that stigma to reputation does implicate a liberty interest if it is accompanied by deprivation of some additional right or interest. Id., dkt. entry no. 264, 12-21-07 Mem. Op., at 24.  Thus, we determined that because D&D asserts that the damage to its reputation was accompanied by its termination from the Project contracts and loss of prequalification status, bonding capacity, and ability to bid on other public works contracts, D&D has sufficiently alleged that it has a protected liberty interest in its reputation under the Fourteenth Amendment, which the Board and its attorney interfered with.  Id. at 25; see id., dkt. entry no. 58, Am. Compl., at 22-23.

D&D's allegations in count 2 do not fall within Coverage A because count 2 rests solely upon intentional conduct, and thus, does not arise from an "occurrence", which is expressly defined as an accident.  (See dkt. entry no. 56, Hoffman Cert., Ex. G, Zurich Policy, at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage A; id. at Commercial General Liability Coverage Form, Section V-Definitions, ¶ 13.)  See Vaughner v. Pulito, 804 F.2d 873, 877 (5th Cir. 1986) (concluding that policy language providing coverage for bodily injury or property damage caused by an "occurrence", which was defined as

48

an accident, did not extend to civil rights causes of action because they are predicated on intentional conduct); Bd. of Educ. of Twp. of Union County v. N.J. Sch. Bds. Ass'n Ins. Group, 719 A.2d 645, 651 (N.J. App. Div. 1998) (concluding that a general liability policy covering bodily injuries resulting from an "occurrence", which was defined as an accident, did not provide coverage for civil rights claims asserted under the Individuals with Disabilities Education Act, Americans with Disabilities Act, and 42 U.S.C. § 1983); John's Cocktail Lounge, Inc. v. Greeley, 563 A.2d 473, 477 (N.J. App. Div. 1989) (concluding that policy language providing coverage for bodily injury or property damage caused by an "occurrence", which was defined as an accident, did not cover intentional wrongful discharge claim).  However, the Court finds that D&D's allegations in count 2 do fall within Coverage B of the Zurich Policy.

Coverage B expressly states that Zurich will indemnify the Board with respect to all sums the Board becomes legally obligated to pay as damages "because of 'personal and advertising injury'".  (Dkt. entry no. 56, Hoffman Cert., Ex. G, Zurich Policy, at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage B.)  The Zurich Policy does not limit a "personal and advertising injury" to injuries resulting from libel, slander, or defamation.  Instead, "personal and advertising injury" is defined more broadly in the Zurich Policy

49

as any injury arising out of, among other offenses, an oral or written publication that slanders or libels an organization, or simply <u>disparages</u> an organization's products or services.  (<u>Id.</u> at Commercial Gen. Liability Coverage Form, Section V-Definitions, ¶ 14.)

In count 2, D&D does not assert a libel or slander claim against the Board.  Instead, it asserts that the Board interfered with its liberty interest in its reputation in violation of the due process clause of the Fourteenth Amendment by publishing false statements stating that D&D performed its work in a sloppy, incomplete, and defective manner, left work unfinished, and abandoned the Project.  See <u>D & D Associates, Inc.</u>, No. 03-1026 (MLC), dkt. entry no. 58, Am. Compl., at 21-23.  Thus, although count 2 cannot be characterized as asserting a defamation claim against the Board, it does generally assert that D&D is entitled to damages because the Board published statements wrongfully disparaging its services.  (<u>See</u> dkt. entry no. 89, 2-28-08 Greenberg Letter, at 3-4 (arguing that the allegations in count 2 "fall squarely within Coverage B of the Zurich Policy").) Accordingly, the Court finds that in count 2, D&D essentially contends that the Board violated its rights under the Fourteenth Amendment by causing a "personal and advertising injury".[12]

_____

[12] Zurich argues that under <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225 (3d Cir. 2006), D&D would be entitled to a name-clearing hearing, a form of injunctive relief, if it prevails on its claim

Our analysis does not end here, however, because the Court must consider whether any policy exclusion applies to count 2. The Zurich Policy provides that Coverage B does not apply to, inter alia, "'personal and advertising injury' arising out of breach of contract". (Dkt. entry no. 56, Hoffman Cert., Ex. G, Zurich Policy, at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage B, Exclusions.)  Applying the expansive definition of "arising out of" employed by New Jersey courts, we conclude that the personal and advertising injury D&D alleges in count 2 originated from, grew out of, and has a substantial nexus with D&D's breach of contract claim against the Board.  See Am. Motorists Ins. Co., 713 A.2d at 1010. Specifically, the civil rights violation alleged in count 2 arises from the same essential facts and circumstances underlying the Board's alleged breach of the Project contracts, including the Board's (1) interference with D&D's performance of its work

---

that the Board violated its rights under the Fourteenth Amendment by damaging its reputation and terminating it from the Project contracts. (Dkt. entry no. 91, 3-24-08 Hoffman Letter, at 3.) Thus, Zurich contends that because Coverage B only obligates Zurich to pay damages and does not impose any obligations on Zurich with respect to injunctive relief, count 2 of the Amended Complaint does not fall within Coverage B. (Id.)  However, in Hill, the Third Circuit noted, "[w]e have not in the past decided – and do not have occasion to decide here - whether a plaintiff who prevails on a 'stigma-plus' claim may be entitled to remedies other than a name-clearing hearing."  455 F.3d at 236.  Thus, it is unclear whether the Board may be required to pay damages if D&D prevails on count 2.

on the Project, (2) issuance of default letters threatening termination, (3) publishing false statements about D&D's performance of the Project contracts, and (4) wrongful termination of the Project contracts.  In fact, this Court only permitted count 2 of the Amended Complaint to go forward because D&D alleged that the Board's damaging of its reputation was accompanied by the additional deprivation of the Board's terminating D&D from the Project contracts.  See id.

Applying the "but for" test endorsed by the Third Circuit, we further conclude that the contractual relationship between D&D and the Board was "endemic" to D&D's due process claim in count 2.  See Houbigant, Inc., 374 F.3d at 202-03.  The Board's alleged misconduct underlying count 2 was not independently tortious, but instead, arose from the Board's alleged breach of the Project contracts.  Id.  Thus, the damage to D&D's reputation, which forms the basis of its procedural due process claim against the Board, would not have occurred but for the Board's termination of the Project contracts.  In fact, the Board published the statements that allegedly damaged D&D's reputation in an attempt to explain its reasons for terminating the Project contracts, namely D&D's poor performance.  See id.  Therefore, the Court finds that Zurich is not obligated to indemnify the Board or pay

any defense costs with respect to D&D's procedural due process claim under the Fourteenth Amendment.[13]

### 3. D&D's Tortious Interference Claim Against the Board

The Board asserts that the Zurich Policy provides coverage for D&D's tortious interference with prospective economic advantage claim against the Board (count 10 of the Amended Complaint).  (Dkt. entry no. 86, 2-28-08 Greenberg Letter, at 4-7.)  In count 10, D&D alleges that the Board and others published false statements on the Board's website, which suggest that D&D performed sloppy, incomplete, and defective work, refused to comply with its obligations, left work unfinished, and abandoned

---

[13] The Board argues that Zurich is estopped from asserting that the breach of contract exclusion to Coverage B applies here because (1) Zurich agreed to defend the Board in a letter dated May 14, 2003, (2) Zurich did not raise any objections to coverage or exclusions with respect to D&D's libel and slander claim, (3) it was not until eighteen months after the Board sent the Amended Complaint to Zurich, that Zurich reserved its rights to disclaim coverage for D&D's libel and slander claim on the basis of the breach of contract exclusion, and (4) the parties engaged in related motion practice, but Zurich never mentioned to the Court that it believed the breach of contract exclusion applied to any of D&D's defamation claims.  (Board Br. in Opp. to Zurich Mot., at 19-20.)  D&D commenced the D&D Action on March 10, 2003. Shortly thereafter, in a letter dated May 14, 2003, Zurich informed the Board that it was reserving its rights "to disclaim coverage on the counts of Violation of Civil Rights", as well as other counts asserted by D&D.  (Dkt. entry no. 56, Hoffman Cert., Ex. H, 5-14-03 Farlow Letter, at 6.)  Thus, Zurich is not estopped from asserting the applicability of the breach of contract exclusion to count 2 of the Amended Complaint because it did not unreasonably delay in informing the Board that it may disclaim coverage with respect to claims asserting civil rights violations.  See Griggs, 443 A.2d at 167.

the Project.  D & D Associates, Inc., No. 03-1026 (MLC), dkt.
entry no. 58, Am. Compl., at 40.  Against this backdrop, D&D
argues that the Board and others "intentionally and deliberately
interfered with [its] prospective economic advantage" and caused
D&D to lose its $40 million bonding capacity and ability to bid
on other public works contracts in New Jersey.  Id. at 41.

To establish a tortious interference with prospective
economic advantage claim, the plaintiff must demonstrate (1) a
reasonable expectation of economic advantage, (2) that the
defendant intentionally and malicious interfered with that
expectation, (3) a causal connection between the defendant's
interference and the plaintiff's loss of a prospective gain, and
(4) damages.  Espinosa v. County of Union, 212 Fed.Appx. 146, 157
(3d Cir. 2007); see Printing Mart-Morristown v. Sharp Elecs.
Corp., 563 A.2d 31, 37 (N.J. 1989).  Applying this standard, the
Court found that "to the extent D&D's tortious interference with
prospective economic advantage claim is based on its loss of
bonding capacity, . . . genuine issues of material fact preclude
summary judgment on such claim" insofar as asserted against both
the Board and the other defendants in the D&D Action.  D & D
Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 264, 12-21-07
Mem. Op., at 56.  Such genuine issues of fact include, inter
alia, whether at the time the defendants in the D&D Action
engaged in the allegedly interfering conduct, the Surety was
capable of issuing bonds to D&D.  Id.

54

D&D's tortious interference claim does not fall within Coverage A of the Zurich Policy because D&D has not alleged, and the elements of such claim do not require, any "bodily injury" or "property damage" as those terms are defined in the Zurich Policy.  (Dkt. entry no. 56, Hoffman Cert., Ex. G, Zurich Policy, at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage A (stating that Zurich will indemnify the insured for damages incurred because of "bodily injury" or "property damage"); id. at Commercial Gen. Liability Coverage Form, Section V-Definitions, ¶¶ 3, 17 (defining (1) "bodily injury" as "bodily injury, sickness, or disease sustained by a person", and (2) "property damage" as "physical injury to tangible property" or "loss of use of tangible property that is not physically injured").)  However, D&D's tortious interference claim does fall within Coverage B of the Zurich Policy because D&D has alleged a "personal and advertising injury" as that term is defined in the Zurich Policy.  (Id. at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage B.)

In support of its tortious interference claim, D&D alleges, inter alia, that (1) the Board "falsely and willfully" published statements that it was performing its work on the Project in a sloppy, incomplete and defective matter, refusing to fulfill its duties, and leaving work unfinished, (2) "[t]hese statements tended to blacken and injure the honesty, integrity, morality and

55

commercial reputation" of D&D, (3) the Board intended "to blacken [D&D's] reputation and force it out of business in order to conceal [its] own misconduct", and (4) the Board's conduct interfered with D&D's performance of its contracts, business arrangements with subcontractors and relationship with the Surety.  D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 58, Am. Compl., at 40.  Accordingly, in count 10, D&D essentially contends that it suffered an injury, namely interference, as a result of the Board's publication of libelous statements or statements that disparaged its services.  (See dkt. entry no. 56, Hoffman Cert., Ex. G, Zurich Policy, at Commercial Gen. Liability Coverage Form, Section V-Definitions, ¶ 14 (defining "personal advertising injury" as, inter alia, injury arising out of "[o]ral or written publication . . . that slanders or libels a person or organization or disparages a person's or organization's goods, products or services").)  Therefore, the Court finds that Coverage B applies to count 10 because in that count D&D alleges that it is entitled to damages from the Board because of "personal and advertising injury".  (Id. at Commercial Gen. Liability Coverage Form, Section I-Coverages, Coverage B.)[14]

_____

[14] The Board argues, and the Court agrees, that both count 2 and Count 10 of the Amended Complaint assert "defamation-like" allegations but do not assert only libel and slander claims. (Dkt. entry no. 86, 2-28-08 Greenberg Letter, at 5.)  However, that count 2 and count 10 assert a "personal and advertising injury" based upon alleged libelous or disparaging remarks does not transform these counts into libel and slander claims.  Only

The Court also finds, however, that the "knowing violation of rights of another" exclusion to Coverage B applies to D&D's tortious interference claim.  The "knowing violation of rights of another exclusion" states that Coverage B does not apply to "'[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'".  (Id.)  To state a claim for tortious interference with prospective economic advantage, the plaintiff must show not only that he or she had a reasonable expectation of economic advantage, but also that the defendant acted with "malice", which is defined as intentionally inflicting harm without justification or excuse.  D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 264, 12-21-07 Mem. Op., at 54-55.  See Printing Mart-Morristown, 563 A.2d at 37.  Accordingly, D&D's tortious interference with prospective economic advantage claim essentially alleges that the Board committed a "personal and advertising injury" with malice or intent to inflict such injury.

---

count 11 of the Amended Complaint asserted a libel and slander claim against the Board.  Thus, the Court does not believe that the Board has asserted any position with respect to count 2 or count 10 in support of its separate motions for summary judgment that is inconsistent with its arguments in opposition to Zurich's motion for summary judgment.  (See id. at 5-6; but see 2-8-08 Hoffman Letter, at 10-13 (arguing that in its separate motions for summary judgment against National Union, the Board has taken a position with respect to the scope of count 2 and count 10 that somewhat contradicts its arguments in opposition to Zurich's motion for summary judgment).)

See D & D Associates, Inc., No. 03-1026 (MLC), dkt. entry no. 58, Am. Compl., at 40-41 (asserting that the Board (1) "willfully published statements", (2) intended to blacken D&D's reputation, (3) "intentionally and deliberately interfered" with D&D's contracts, subcontracts, and relationship with the Surety, and (4) intentionally interfered with D&D's prospective economic advantage). Therefore, the "knowing violation of the rights of another" excludes D&D's tortious interference claim from Coverage B.[15] The Court will grant Zurich's motion for summary judgment in its entirety.

**CONCLUSION**

The Court, for the reasons stated supra, will (1) deny the Board's first motion for summary judgment against National Union, (2) deny the Board's second motion for summary judgment against National Union, and (3) grant Zurich's motion for summary judgment against the Board. The Court will issue an appropriate order and judgment.

                              s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge

Dated: May 15, 2008

_____

[15] Because we have determined that the "knowing violation of rights of another exclusion" excludes count 10 of the Amended Complaint from Coverage B, we will not address whether any other Coverage B exclusions, such as the "material published with knowledge of falsity" or "breach of contract" exclusions, also apply.